UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| CHARLES FRITSCHE, | Case No. 3:15-cv-00425-MMD-WGC |
| Petitioner, | ORDER |
| v. | |
| ROBERT LeGRAND, *et al.*, | |
| Respondents. | |

## I.    INTRODUCTION

This represented habeas matter under 28 U.S.C. § 2254 comes before the Court for a decision on the merits. Petitioner Charles Fritsche seeks to set aside his 2009 Nevada state conviction, pursuant to a jury verdict, of sexual assault and lewdness with a child under the age of fourteen. He was sentenced to consecutive sentences of life with the possibility of parole after a minimum thirty-five years served and life with the possibility of parole after a minimum ten years served. He challenged the conviction on direct appeal and state postconviction review. The federal petition, as amended, presents five claims of ineffective assistance of trial counsel.

## II.    GOVERNING LAW

### A.    Standard of Review

When the state courts have adjudicated a claim on the merits, the Antiterrorism and Effective Death Penalty Act ("AEDPA") imposes a "highly deferential" standard for

evaluating the state court ruling that is "difficult to meet" and "which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). Under this highly deferential standard of review, a federal court may not grant habeas relief merely because it might conclude that the state court decision was incorrect. *Id.* at 202. Instead, under 28 U.S.C. § 2254(d), the court may grant relief only if the state court decision: (1) was either contrary to or involved an unreasonable application of clearly established federal law as determined by the United States Supreme Court; or (2) was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. *Id.* at 208.

A state court decision is "contrary to" law clearly established by the Supreme Court only if it applies a rule that contradicts the governing law set forth in Supreme Court case law or if the decision confronts a set of facts that are materially indistinguishable from a Supreme Court decision and nevertheless arrives at a different result. *E.g.*, *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003). A state court decision is not contrary to established federal law merely because it does not cite the Supreme Court's opinions. *Id.* Indeed, the Supreme Court has held that a state court need not even be aware of its precedents, so long as neither the reasoning nor the result of its decision contradicts them. *Id.* Moreover, "[a] federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." *Id.* at 16. At bottom, a decision that does not conflict with the reasoning or holdings of Supreme Court precedent is not contrary to clearly established federal law.

A state court decision constitutes an "unreasonable application" of clearly established federal law only if it is demonstrated that the state court's application of Supreme Court precedent to the facts of the case was not only incorrect but "objectively unreasonable." *E.g.*, *Esparza*, 540 U.S. at 18; *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004).

///

To the extent that the state court's factual findings are challenged, the "unreasonable determination of fact" clause of § 2254(d)(2) controls on federal habeas review. *E.g.*, *Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004). This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id.* The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous." *Id.* at 973. Rather, AEDPA requires substantially more deference to the state court factual finding:

> [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless rebutted by clear and convincing evidence.

**B.    Ineffective Assistance of Counsel**

On Petitioner's claims of ineffective assistance of counsel, he must satisfy the two-pronged test of *Strickland v. Washington*, 466 U.S. 668 (1984). He must demonstrate that: (1) counsel's performance fell below an objective standard of reasonableness; and (2) counsel's defective performance caused actual prejudice. On the performance prong, the issue is not what counsel might have done differently but rather is whether counsel's decisions were reasonable from his perspective at the time. The reviewing court starts from a strong presumption that counsel's conduct fell within the wide range of reasonable conduct. On the prejudice prong, the petitioner must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *E.g., Beardslee v. Woodford*, 327 F.3d 799, 807-08 (9th Cir. 2003).

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). On the performance prong in particular, "[e]ven under a *de novo ///*

review, the standard for judging counsel's representation is a most deferential one."

*Harrington v. Richter*, 562 U.S. 86, 105 (2011). Accordingly,

> *Strickland* specifically commands that a court "must indulge [the] strong presumption" that counsel "made all significant decisions in the exercise of reasonable professional judgment." 466 U.S., at 689–690, 104 S.Ct. 2052. The [reviewing court is] required not simply to "give [the] attorneys the benefit of the doubt," . . . but to affirmatively entertain the range of possible "reasons [defense] counsel may have had for proceeding as they did," . . . (Kozinski, C.J., dissenting). *See also Richter*, *supra*, . . . ("*Strickland* ... calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind").

*Pinholster*, 563 U.S. at 196; *see also Richter*, 562 U.S. at 109-10.

When the deferential review of counsel's representation under *Strickland* is coupled with the deferential standard of review of a state court decision under AEDPA, *Richter* instructs that such review is "doubly" deferential:

> The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at 123, 129 S.Ct. at 1420. . . . . When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Richter*, 562 U.S. at 105.

The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *Pinholster*, 563 U.S. at 569.

## III. DISCUSSION

### A. Ground 1(a): Alibi Defense

In Ground 1(a), Fritsche alleges that he was denied effective assistance when trial counsel failed to present an alibi defense, after having given pretrial notice of the defense.

Fritsche's claim regarding an alibi defense is based in substantial part on what he maintains that the child victim said or was reported to have said in two initial interviews. (*See* ECF No. 13 at 11; ECF No. 28 at 21.) He maintains that he was on the road working as a professional truck driver during the times that the child allegedly stated that he committed the charged acts. This background recital therefore includes the earliest statements or reports of statements by the child on through, *inter alia*, her preliminary ///

4

hearing and trial testimony. The recital focuses on her degree of specificity, or lack thereof, as to the number of incidents and when incidents occurred.[1]

### 1.  Relevant Background

#### a.  Investigation

On May 9, 2008, Sparks Police Department Officer Lehigh responded to a call regarding an alleged sexual assault not then in progress. Officer Lehigh was told that eight-year-old K.L. told her friend H.H. about prior incidents and that H.H. then spoke with H.H.'s mother, who spoke with K.L.'s mother, who then spoke with K.L. During the investigation, K.L.'s mother, Shannon L., told Officer Lehigh that K.L. told her that: (1) her grandmother Joanne L.'s boyfriend, Charlie Fritsche, "would enter her room at night and with his mouth lick her vaginal area and also touch it with a vibrator between her legs on and near her vagina and anus;" (2) that Charlie told her that "it 'helps him and that it was their secret;'" and (3) that K.L. "was very worried for her grandmother because suspect Charlie may get in trouble." (ECF No. 14-2 at 2-5.)[2]

Shannon L. stated further that: (1) her mother and Fritsche were truck drivers; (2) they had been on the road working and had left again that morning; and (3) K.L. had "not been over to the [grandmother's] residence in the past month due to her grandmother's work schedule, and it is unknown when the last contact [K.L.] had with" Fritsche. (*Id.*)

The other child, nine-year-old H.H., stated that "around January of 2008, . . . [K.L.] confided to her that her grandmother's boyfriend, Charlie, was touching her inappropriately." Since that time, she had received instruction at school about

---

[1]The Court summarizes prior statements and reports of statements to place trial counsel's decision regarding an alibi defense heading into trial into context. An alibi defense at trial, however, necessarily would have to take into account, in one manner or another, the child's anticipated testimony at the time of the trial, not solely what she allegedly said in an earlier interview. This recital does not summarize all statements and/or trial evidence, as the recital focuses primarily on the alibi defense.

[2]As K.L.'s later direct statements reflect, the terminology used by her mother and/or the officer in the police report was not the same terminology used by K.L., although the substance of her later statements was consistent with the more clinical terminology used in the report. The statement of K.L.'s age was redacted from the federal court exhibit. She then was eight. (ECF No. 14-5 at 41.) Respondents have not maintained that the police report was not in the state court record on state postconviction review.

inappropriate touching. She therefore informed her mother when K.L. discussed inappropriate touching that evening. (*Id.* at 3, 5.)

Officer LeHigh did not interview K.L. directly, and the police made no referral for a sexual assault examination at that time due to the interval involved. (*Id.* at 4-6.)

Detective John Patton was assigned the case on May 13, 2008. Patton conducted a recorded interview with K.L. on May 15, 2008. (ECF No. 16-8; ECF No. 16-10 at 2.)

K.L. related that she was in the second grade after having been held back a year.[3] When Detective Patton asked her about "Charlie," she responded:

> KL:   . . . . When I'm sleeping if grandma's not a, I mean asleep. If she's asleep he goes and um he uses a vibrator and sometimes with his tongue.

When Detective Patton asked how many times that had happened, she responded:

> KL:   Um I kinda haven't been counting, but all I remember is the two (2). That's all I remember is two (2).
>
> JP:   Okay.
>
> KL:   That's all. Because it's kind of been you know a long time.

(ECF No. 16-8 at 3, 7-8.)

When Detective Patton asked K.L. whether she remembered "when this all started," she responded initially:

> KL:   I think it was like, I think it was, yeah, I think it was the beginning of this year. I think. I don't know. I can't, I can't remember because it's been a, like a really long year.
>
> JP:   Yeah.
>
> KL:   And I can't remember so, I think it was beginning.

(*Id.* at 9.)

Detective Patton asked K.L. whether it was before or after Christmas, and she responded: "Before I think." He then had to prompt her with several questions to establish that Thanksgiving rather than Halloween was the next holiday before Christmas. When he then asked whether it was after Thanksgiving and before Christmas, she responded:

---

[3]K.L. had a vision impairment. (*E.g.*, ECF No. 14-10 at 57-58, 90-95.)

"Before Thanksgiving. I think. I think." Patton then asked how that response related to her initial statement that the incidents started at the beginning of the year, and he again attempted to identify a specific beginning time with reference to holidays:

> JP: Okay. So that would be longer than the beginning of this year, right? Because this was New Year's Eve, right?
>
> KL: Uh huh. Because it um I think 2008 started like after be, Christmas (laughs).
>
> JP: It's okay.
>
> KL: After Christmas.
>
> JP: After Christmas correct.
>
> KL: Uh huh.
>
> JP: So do you think it was after Christmas?
>
> KL: No, I think it was like before.
>
> JP: Before Christmas.
>
> KL: Thanksgiving.
>
> JP: Okay. Was it before Halloween?
>
> KL: *I kind of don't know.*
>
> JP: Okay. Um.
>
> KL: That's.
>
> JP: That's okay.
>
> KL: *A long, long, long, long, long way away.*

(*Id.* at 9-10 (emphasis added).)

K.L. had stated earlier in the May 15, 2008 interview that the last time that she had seen Fritsche and her grandmother "was last week" and that she "got to spend the whole week with grandma and him, [and] my uncle." (*Id.* at 8.) When Detective Patton later asked her when the last incident was she initially said: "Last week." However, in her very next response, she stated:

> KL: I, wait. Hold on. He told me that if grandma's not awake, but she wasn't, so he didn't do it to me last week. I don't remember the last time. But I don't remember the last time.

7

(*Id.* at 10-11, with continuing discussion of the point thereafter on 11.)[4]

On May 31, 2008, Nurse Practitioner Denise Cornell conducted a sexual assault examination on a referral from Detective Patton. (ECF No. 16-9.) K.L.'s statements regarding the cunnilingus and vibrator use substantially corresponded to her statements to Detective Patton. She additionally reported to Cornell that Fritsche would have her hold "it," *i.e.*, his penis; that he tried to put it in her mouth but she would not; and that when he would ejaculate he told her that girls swallow it but she would not, so he ejaculated on the ground. (*Id.* at 4, 6.) The report did not directly quote K.L. regarding either the number of incidents or the timing of the first and last incidents. In the space following "Possible date(s) of abuse/assault" Cornell handwrote in the May 31, 2008 report: "started ~ age 7, last incident ~ 2 wk ago." (*Id.* at 4.)[5]

_____

[4]During the course of the interview, K.L. elaborated further on what Fritsche did and said during the sexual incidents. Her language—in isolation—would have been at least as consistent with there having been more than two incidents as with there having been only two incidents. (*See* ECF No. 16-8 at 8-9, 11-13.) For example, regarding the vibrator, she discussed different things that he did each "sometimes" as opposed to doing something one time or both times. (*See id.* at 13.)

The interview transcript clearly was in the record before the state courts. (*See, e.g.*, ECF No. 15-13 at 2; ECF No. 31 at 2.)

[5]The tilde symbol (~) represents "about" or "approximately." The medical report and accompanying application or authorization for medical examination were in the state court record on postconviction review. (*See* ECF No. 15-13, at 2; ECF No. 15-17 at 2.)

Fritsche states in both the first amended petition and reply that "[i]n her interview with Nurse Cornell, however, [K.L.] stated the second incident occurred in April of 2008." Fritsche cites to: "(See Ex. 45, at 1 (medical report of Washoe County Sexual Response Team).)" (ECF No. 13 at 11; ECF No. 28 at 21.) However, the record does not support this statement.

The cited page of Exhibit 45 is not a medical report, and it was not prepared by Nurse Cornell. Page 1 of the exhibit instead is the *authorization* for the medical examination prepared and signed by *Detective Patton* on May 27, 2008, *four days before* the examination. In the space following "Date(s) of Assault" is handwritten: "4/08." (ECF No. 16-9 at 2.) K.L. made no statement to Detective Patton during the May 15, 2008 interview that the last incident occurred in April 2008. There is no evidence in the record that Patton spoke with her again between May 15, 2008, and May 27, 2008. (*See* ECF No. 16-10 at 4.)

It thus would appear that the "4/08" reference likely was Detective Patton's own general guestimate, given K.L.'s inability on May 15, 2008, to recall and state specifically when the last incident occurred. Nurse Cornell's *medical report*, in contrast, instead would tend to support an inference that *K.L. told her—during the May 31, 2008 interview and examination*—that the last incident occurred about two weeks prior to the May 31, 2008 examination, in approximately mid-May 2008. (*See also* ECF No. 14-10 at 114.)

8

After their return from being on the road, detectives interviewed Joanne L. and Fritsche separately on June 13, 2008.

According to Detective Patton's supplemental report, Joanne L. related, *inter alia*, the following when interviewed by detectives:

> [In] an earlier incident this year . . . Joanne had woken up at approximately 1:00 a.m. and found that Charles was not sleeping next to her. Joanne went to go check around the house, looked in [K.L's] room; however, it was too dark to see the whole room. She also went upstairs to her son's room and could not locate Charles. When she went back into her bedroom she noticed that Charles was sleeping in the bed. She asked Charles where he was. Charles told her that he had fallen asleep in [K.L.'s] room. Joanne was adamant that it was a night in which [K.L.] had spent the night. She thought that it was very strange that he had fallen asleep in her room. . . . .

(ECF No. 16-10 at 6.)[6]

In his interview, Fritsche repeatedly denied, throughout, having done anything improper with K.L. He initially gave the impression that he was not even very familiar with her name, replying that her name was "K____, K_____, K____, something like that." Also initially, he stated that she had stayed over only "a couple of times," "a long time ago," "[p]robably four (4) months ago, five (5) months ago," either before or around Christmas. (ECF No. 29-2 at 4-5, (all three name references are redacted in the exhibit).)[7]

Fritsche acknowledged shortly thereafter, however, that K.L.'s mother, Shannon L., would "dump her off" at her grandmother's house. He complained over the course of the interview about Shannon L. having them babysit her child while "she'll take off for three (3) or four (4) days" at a time, at a time when "both of us [weren't] working." Fritsche further acknowledged that the last time that K.L. had been at the house was "like six (6)

---

The affirmative statement that "[i]n her interview with Nurse Cornell, however, [K.L.] stated the second incident occurred in April of 2008," with a citation to page 1 of Exhibit 45 as support, therefore is a misstatement of the record.

[6]Respondents have not maintained that the supplemental report was not in the state court record. The underlying transcripts of the June 13, 2008, interview of Joanne L. clearly were in the state court record. (ECF No. 15-13, at 2; ECF No. 15-17, at 2.) It does not appear that Fritsche – who is claiming that defense counsel should have called Joanne L. as an alibi witness – included Joanne L's June 13, 2008, interview transcripts in the federal exhibits.

[7]The transcript of the interview of Fritsche was in the state court record. (ECF No. 15-13 at 2; ECF No. 15-17 at 2.)

9

weeks ago, I think," which would have lined up with early May. He maintained at first, however, that she was there only one night and that she arrived after he already "was pretty much asleep." He later maintained, however, that K.L. and her mother only stopped by and that he and Joanne L. instead pulled out on another over-the-road run that night. (*Id.* at 6-7, 10-12, 16, 31-32, 58, 62.)[8]

As Fritsche responded to questions or sought to make points of his own, he made multiple additional tangential references yet further confirming – by one detail after another – that he and the child had been in the house together on a recurring basis, including during overnight stays. (*See, e.g., id.*, at 18-19, 21, 27, 30 & 51.)

Fritsche denied going into K.L.'s room when she was there. At one point, he maintained that he had "tucked her in one (1) time" "last year" but "that was it." He later asserted instead that the "[o]nly time I go in there is fix the window one time" and "[t]hat's it." (*Id.*, at 8 & 35.) He maintained that K.L. was not in the room the night that he was sleeping in her room when Joanne L. was looking for him in the middle of the night. (*Id.*, at 26-27.)

About halfway through the interview, Fritsche suggested that Joanne L. was framing him. Thereafter, after the detectives had told him that he was going to be arrested, Fritsche spent approximately the final third of the interview claiming, in one extended discourse after another, that Joanne L. and at one point Shannon L. were framing him and trying to set him up by, *inter alia*, coaching K.L. to make the complaints. He maintained that Joanne L. was, in a detective's wording, "diabolical." He told the detectives that Joanne L. had "done all, you know stuff to me that you wouldn't believe,"

---

[8]Fritsche's statements regarding vibrators similarly changed over the course of the interview. He initially denied that there had been any such sex "toys" in the house, maintaining that there only had been a big back massager that "broke a long, long time ago." (ECF No. 29-2 at 12-14, 34-35.) Later, however, he acceded that K.L. may have seen a vibrator before because Joanne L. "used to have a box of 'em underneath the bed, but I don't know what happened to them." (*Id.* at 51-52.) When detectives asked whether they would find a vibrator when they searched his truck, he allowed that "[t]here might be" one," but that it would have been planted by Joanne L. (*Id.* at 52.) When the police then did find a vibrator in his backpack in his truck, he continued to maintain that Joanne L. put it there. (*E.g., id.* at 56-57.)

10

that "she does all kinds of stuff to me," and "I can't get rid of her." Fritsche told the detectives that Joanne L. was trying to send him back to prison, like she had done with a prior boyfriend, so that she could take all of his money and belongings. (*Id.*, at 32-33, 47-53, 56-65, 68.)

### b. Pretrial Proceedings

On June 23, 2008, Fritsche was charged by a criminal complaint with one count of sexual assault and one count of lewdness with a child under the age of fourteen. The two counts each alleged that Fritsche committed the offense "on or between the 1st day of January, 2008, and the 31st day of May, 2008." The sexual assault count alleged that Fritsche unlawfully subjected K.L. "to sexual penetration against his [sic] will, in that the defendant caused the victim to submit to cunnilingus." The lewdness count alleged that Fritsche "placed his mouth and/or a vibrator upon said victim's genitalia with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of himself or the child." (ECF No. 14-3.)

At the September 3, 2008 preliminary hearing, K.L. testified, in her own child's terminology, to, *inter alia*, a number of different incidents occurring in different locations. She testified that Fritsche, after telling her to pull down her clothing, would perform cunnilingus on her, insert a vibrator in her vagina, show her his penis, have her hold his penis, and stimulate and/or have her stimulate his penis to ejaculation. He would perform one or more of these acts in her bedroom at her grandmother's home while her grandmother was asleep, in the living room and the grandmother's room when the grandmother was not present, and in the sleeping cab area of Fritsche's truck, *i.e.*, the "tractor" of a tractor/trailer rig. (ECF No. 14-5 at 22-37.)[9]  When the prosecutor asked "how many times did it happen that he came into your bedroom with the vibrator," she responded: "I don't remember how many, but I think it was like 10 or – 10 or 20. I don't remember." (*Id.* at 26.) K.L. testified that the incidents started when she was in second

---

[9]The then nine-year-old girl at that time referred to both male and female genitalia as "pussy." (*Id.* at 14-15, 18-19, 41.)

grade (she then was in third grade) after her eighth birthday in July. (*Id.* at 7-8, 23-24, 41.)[10] She could not remember specific days or years but instead only that incidents happened at night during her visits at her grandmother's, during which she often stayed several nights. (*Id.* at 37-38, 40.) She could not recall what she had told the detective about when the last time occurred. (*Id.* at 42.)

At the end of the hearing, the State amended the criminal complaint to: (1) change the date range on both counts to "on or between the 3rd day of July, 2007, and the 15th day of May 2008;" (2) amend the sexual assault count to add "and/or placed a vibrator inside said victim's vagina;" and (3) amend the lewdness count to include allegations that Fritsche "did direct said child to remove her clothes and/or" as well as "and/or direct said child to touch his penis with his hand." (ECF No. 14-4; ECF No. 14-5 at 54-57.)[11]

Thereafter, after the case was bound over to the district court, Fritsche was charged on September 12, 2008, by an information, which tracked the charges and allegations in the amended criminal complaint. (ECF No. 14-6.)

On February 23, 2009, Fritsche gave notice of intent to claim alibi. The notice listed Alex Amezcua and Joanne L. as alibi witnesses. The notice stated that the witnesses "will be able to testify as to the absence of the Defendant and Joanne [L.] during the bulk of the time that these allegations cover in the Information . . . occasioned because of Defendant's occupation as a cross-country long-haul truck driver." (ECF No. 14-7.)

On March 5, 2009, the state district court granted the State's motion to amend the information. The amended information carried forward the same dates and operative allegations and added an allegation that Fritsche subjected K.L. to sexual penetration "against her will or under conditions in which the defendant knew or should have known

---

[10]K.L. was in a year-round school program. (*Id.* at 7.)

[11]Fritsche's exhibit index lists the date for the amended complaint as June 23, 2008, which was the same date as the original complaint. (*See* ECF No. 14 at 2.) A comparison between the amended criminal complaint exhibit (Exhibit 4) and the cited pages of the preliminary hearing transcript (Exhibit 5) clearly establishes that—the earlier file stamp from the filing of the original complaint notwithstanding—the amended complaint was prepared on September 3, 2008. The prosecutor simply wrote the amendments by hand on a copy of the previously file-stamped original criminal complaint, and the justice court recognized the amendments as having been made.

that the victim was mentally or physically incapable of resisting or understanding the nature of the defendant's conduct." (ECF No. 14-8.)

### c. Trial

At the March 2009 trial, H.H. did not remember either stating that K.L. told her about a "bad touch" prior to the evening of May 9, 2008, or that K.L. had told her about it before then. (ECF No. 14-10 at 35-38.) H.H.'s mother testified that H.H. had told her that evening that K.L. had told her about a bad touch earlier in January. (*Id.* at 49-53.)

K.L.'s mother, Shannon L., testified, *inter alia*, that: (1) K.L. had been staying at her grandmother's one to two weekends a month during the relevant time period from July 2007 up through May 2008; (2) Fritsche lived with K.L.'s grandmother Joanne L. during that general time period; (3) Fritsche drove a truck for a living, and Joanne L. started going on the road with him starting in approximately late 2007, possibly August 2007, and continuing into June 2008; (4) Fritsche and Joanne L. would "come back probably for three to four days and leave again for a month at a time," such that they would be back at Joanne L.'s home five to six times during a six month period; (5) "[w]henever my mom came back into town [K.L.] went to see her;" (6) prior to the time that Joanne L. started going on the road with Fritsche, he "[o]ccasionally" would be at Joanne L.'s home; (7) Fritsche and Joanne L. had just left from Sparks to go on the road on the morning of May 9, 2008, and they remained on the road until June; and (8) K.L. had been at Joanne L.'s house "[t]he weekend or the day before I found out, before May 9th." (ECF No. 14-10 at 59-64, 80, 82-84, 87-89, 97-98.)

K.L. testified at trial, again in her own child's terminology, that Fritsche performed cunnilingus on her in her bed and on the couch in the living room. She responded "[m]ore than I can count" when asked how many times, and she later testified "like 10 or 15" times, including only one time in the living room. (ECF No. 14-12 at 50-51, 67-70, 72, 75-78.) She testified that Fritsche put a vibrator inside her vagina "a few times," but in further testimony she indicated that he used the vibrator instead on the outside. She later testified that he used the vibrator on her "like three or four times." (*Id.* at 51-60, 70-72, 75-76.) K.L.

additionally testified that Fritsche exposed his penis to her in his truck, had her touch it, and then stimulated himself until he ejaculated. She testified that this occurred during two different incidents in the truck, and she additionally testified that he stimulated her genitals during another incident. (*Id.* at 60-66, 70, 76-78, 123-25.) K.L. did not identify any specific dates when any of the incidents occurred or when the first or last incidents occurred.

Defense counsel presented no alibi defense at trial.

### 2.    Post-Conviction Proceedings

At the state postconviction evidentiary hearing, the represented Fritsche established through the testimony of an investigator that neither of the two potential alibi witnesses listed in the pretrial notice of alibi defense—Alex Amezcua and Joanne L.—could be located with sufficient specificity to obtain their presence. The investigator did speak with another individual, a Richard Gartner of Gartner Transportation. Gartner was unable to provide any useful information regarding records of Fritsche's employment; and he indicated that he had turned over all such information to the district attorney's office prior to the trial. (ECF No. 15-16 at 150-55.) Fritsche, who has the burden of both production and proof in state and federal postconviction proceedings, therefore was unable to present live testimony from any alibi witness tending to establish that defense counsel could have presented a viable alibi defense at trial.

A report of a pretrial February 24, 2009 telephone interview of Alex Amezcua by prosecution investigator Michelle Youngs was admitted at the hearing as a business record of the district attorney's office. (ECF No. 15-16 at 171-81.) Youngs' report reflects that Amezcua initially asked her whether he should talk to her because he was a defense witness. After she spoke with him about that concern, Amezcua stated to her, *inter alia*, that: (1) while "he was not sure of the hire date," he believed that Fritsche "began working for him in October or November of 2007 and ended employment in January 2008 when he lost his business," *i.e.*, his company Sierra Pacific Express; (2) "[d]uring that time," he "was assigned routes in Washington and the Midwest;" and (3) Amezcua "estimated these routes kept [Fritsche] out of Reno/Sparks 95% of the time." (ECF No. 29-1 at 2.)

According to the report, Amezcua further stated that: (1) Amezcua was aware that Joanne L. was riding with Fritsche, which was not authorized; (2) Amezcua asked Fritsche on several occasions to keep her out of the truck; (3) Fritsche told him in response that "he had no choice about it because [Joanne L.] had threatened him;" (4) the relationship between Fritsche and Joanne L. was "strained;" (5) Amezcua "received at least six calls from [Joanne L.] accusing [Fritsche] of using drugs and getting into trouble with the law;" (6) Joanne L. "asked him not to allow [Frische] to leave on routes without her and said if he left her she would do something bad;" and (7) such calls stopped only after Amezcua told Joanne L. that he would get a restraining order against her. At the conclusion of the interview, Amezcua asked Youngs "if he was now a prosecution witness." (*Id.* at 2-3.)

At the evidentiary hearing, unauthenticated records from Gartner Transportation were admitted for purposes of the hearing only. Testimony reflected that the materials had been sent to the district attorney's office and that the prosecutor had emailed copies to defense counsel, in rebuttal to the possible alibi defense. (ECF No. 15-16 at 47-56, 173-76.)

The unauthenticated Gartner Transportation records consist of two different sets of documents.

The first set consists of daily credit card transaction activity reports reflecting reimbursable refueling and other expenses incurred by Gartner drivers, including Fritsche, at truck stops during their drives across the country. These materials cover two nearly-continuous periods, from March 7, 2008, through April 23, 2008, and June 5, 2008, through June 8, 2008. (ECF No. 16-5 at 2, 45, 46-50.) The latter period of course was not material to the charges.

The second set consists of driver trip records specifically for Fritsche. These reports identify the origin and destination cities on a particular run, along with intervening stops along the way for, *inter alia*, pickups, deliveries, and refueling. The earliest date in these reports is March 10 and the last date is June 10, apparently in 2008. (ECF No. 16-6 at 2, 5, 27.)

The two sets of documents overlap to an extent.[12] Therefore, collectively, the records, if authentic, would tend to paint a fairly clear picture of when Fritsche either was or could have been in the Sparks area from early March 2008, through the May 15, 2008, back end of the period charged in the amended information.

According to the above-cited materials, Fritsche at the very least passed through Sparks on March 11, 2008, on the run from Ripon to Kent, which apparently was his first run for Gartner Transportation. Thereafter, on a run from Lexington, Nebraska, to Oakland, California, Fritsche again at the very least would have passed through Sparks on his way west, as reflected by his refueling on the way on April 21, 2008, at a truck stop three hours to the east of Sparks on Interstate 80 in Battle Mountain, Nevada. (ECF No. 16-5 at 43; ECF No. 16-6 at 16.)

Further, according to the driver trip reports, Fritsche ended a run in Sparks on May 5, 2008. The next trip report starts another run, from Sparks, four days later, on May 9, 2008. (ECF No. 16-6 at 19-20.) This interval lines up with, *inter alia*, Shannon L.'s trial testimony regarding the last time that K.L. stayed overnight with Fritsche and Joanne L. before she reported the sexual abuse.

Neither the Amezcua interview report nor the unauthenticated Gartner Transportation materials addressed Fritsche's whereabouts or activities from the July 3, 2007, beginning of the period charged in the amended information through to his being hired by Amezcua in vaguely "October or November 2007." The Amezcua interview report further did not tend to establish that Fritsche was not in Sparks at any specific relevant time from that vague "October or November 2007" start through the end of the employment also vaguely in "January 2008." Inherent in Amezcua's statement that Fritsche was "out of Reno/Sparks 95% of the time" was a statement that Fritsche was *in* Reno/Sparks for 5% of the time during that period. Nor did either the Amezcua interview

---

[12]For example, a March 11, 2008 credit card transaction for refueling at a "TA" truck stop in Sparks, Nevada, also is reflected on the fuel purchase record portion of a driver trip record report for a run originating in Ripon, California, and ending in Kent, Washington. The refueling records match down to the specific invoice number, cost, and amount of fuel. (*Compare* ECF No. 16-5 at 4 *with* ECF No. 16-6 at 2.)

report or the Gartner materials address Fritsche's whereabouts or activities from the end of his employment with Amezcua in or around January 2008 through the point where he apparently began working for Gartner in early March 2008.

In his evidentiary hearing testimony, Fritsche testified, *inter alia*, that defense counsel told him that if he testified Joanne L. would take the stand and "destroy" him. Fritsche testified that he was afraid that Joanne L. would do so because she had "done some pretty devious stuff" to him in the past, including calling employers telling them they should fire him because he was driving and doing drugs. Fritsche testified that Joanne L.—the same woman who had done "some pretty devious stuff" to him—would have been the last person in possession of his own personal driver's logbook after his arrest. (ECF No. 15-16 at 167-69.)

Defense counsel Carl Hylin testified at the evidentiary hearing, which was held over four-and-a-half years after the trial. Counsel testified, *inter alia*, that he filed a notice of alibi defense "in case we could actually formulate an alibi defense," but "[i]t never really congealed in[to] what you would consider an alibi defense." On the one hand, "[t]here never was any definite timeframe that was established" for the earliest incident during Detective Patton's interview of K.L., even with the detective's attempt to use holidays to nail down the timeframe. On the other, an alibi defense based upon work logs or records "never materialized" because the materials that the defense was able to obtain "were woefully inadequate." (*Id.* at 36-43; *see also id.* at 47-60.)

Defense counsel further reflected a concern that both witnesses listed in the alibi notice potentially might have done more harm than good. The defense investigator initially reported that Amezcua had been friendly and cooperative. However, when the defense investigator talked with Amezcua again after the prosecution investigator had informed him what Fritsche was charged with, Amezcua "was hostile, he didn't want anything to do with our investigation." Defense counsel therefore did not examine Amezcua's possible testimony further because he "became very uncooperative." Counsel testified that the possibility of using Joanne L. as an alibi witness "ended up blowing up in our face, [as]

she became completely uncooperative," with the defense investigator reporting to him verbally that she would hurt the defense if she was called. Counsel testified that therefore "it would have been foolish of me to put her on the stand." (*Id.* at 41-44, 57-59, 61-63; *see also id.* at 125-27.)

Counsel testified that, with Fritsche being unemployed during portions of the time covered by the charges, it would not have been difficult for the prosecution or the victim to say that incidents occurred while Fritsche was not driving. Therefore, in counsel's opinion "it was dangerous grounds trying to assert an alibi when I couldn't establish any dates, firm dates from [K.L.] when these events occurred, and it was spotty trying to match them up with the records that I had that Fritsche had." (*Id.* at 59-60, 63; *see also id.* at 64-67, 110-11.)

The state appellate court rejected the claim presented to that court on the following grounds:

> *Alibi defense*
>
> Fritsche claimed that counsel was ineffective for failing to present an alibi defense and call alibi witnesses at trial despite having filed an alibi defense notice.
>
> Counsel testified that he filed the alibi defense notice to be used in the event that he was able to create or find a basis for such a defense. The primary reason he chose to abandon this defense was that the proposed alibi witnesses became hostile to the defense. He ultimately concluded that the alibi defense was "dangerous ground" and made a strategic decision to abandon the defense because it was not "air tight." The district court found that counsel testified credibly, counsel made a sound decision to abandon the alibi defense because the defense was not complete, and Fritsche failed to establish that counsel's performance was deficient on this ground.
>
> The record supports the district court's findings and we conclude that Fritsche failed to demonstrate that counsel's performance was deficient in this regard. *See Doleman v. State*, 112 Nev. 843, 848, 921 P.2d 278, 280–81 (1996) ("A strategic] decision ... is virtually unchallengeable absent extraordinary circumstances." (internal quotation marks omitted)).

(ECF No. 16-2 at 3-4.)

### 3. Analysis

The state court's rejection of this claim was not an objectively unreasonable application of *Strickland*'s performance prong.

In federal court, Fritsche maintains, *inter alia*, that: (1) "[i]n her police statement," K.L. stated that two incidents happened; (2) "[o]ne occurred after Halloween and before Thanksgiving of 2007," according to her interview with Detective Patton; (3) "[i]n her interview with Nurse Cornell . . . [K.L.] stated the second incident occurred in April 2008; (4) Amezcua confirmed that Fritsche was on the road for his company 95% of the time between November 2007 and January 2008, and Joanne L. also stated that she was on the road with Fritsche in November and December; (5) Gartner's records establish that Fritsche was not in the Sparks area during April 2008; and (6) Fritsche therefore "had a credible alibi for the great majority of time during which [K.L.] claimed the abuse occurred." He contends that trial counsel therefore denied him effective assistance of counsel when he did not pursue an alibi defense at trial. (ECF No. 13 at 11-13; ECF No. 28 at 21-27.)[13]

Fritsche's federal claim is based upon fundamental misstatements of the state court record.

The child did *not* state in her police interview that a first incident "occurred after Halloween and before Thanksgiving of 2007." When Detective Patton asked K.L. whether "it was before Halloween," she responded: "*I kind of don't know.*" She then followed up with the remark: "*A long, long, long, long, long way away.*" That is not a statement by the child that a first incident "occurred after Halloween and before Thanksgiving of 2007." It is a misrepresentation of the record to allege that the child made such a statement.[14]

The child also did *not* state in "her interview with Nurse Cornell . . . the second incident occurred in April 2008." The portion of the record cited by Fritsche to support this assertion is an authorization to conduct the Cornell examination completed by Detective

---

[13]On a minor point, in the first amended petition and reply, Fritsche erroneously transposes Amezcua's Sierra Pacific and Gartner Transportation. He maintains in his conclusion that the Sierra Pacific materials establish his whereabouts in April 2008 and that the Gartner materials establish his whereabouts in November 2007. (*E.g.*, ECF No. 13 at 13.) Counsel simply has the companies reversed in his filings.

[14]Nor did the child's overall interview reflect even that a first incident occurred necessarily during November prior to Thanksgiving 2007. Typical for an eight-year-old child, she was not good with dates. With particular respect to Thanksgiving, she stated at one point: "Before Thanksgiving. *I think. I think.*" (ECF No. 16-8 at 9 (emphasis added).)

Patton *four days before* that examination and interview. The "4/08" reference in the exhibit is a statement *by Detective Patton* in the authorization, *not by the child* in the interview with Nurse Cornell. The record does not reflect that any such statement was made by the child to Nurse Cornell. Rather, her notes instead reflect—based on what the child told *her* during the interview—that the last incident occurred approximately two weeks prior to the May 31, 2008 examination. (*See supra* note 5 and accompanying text.) It is a mistatement of the record to allege that the child stated in "her interview with Nurse Cornell . . . the second incident occurred in April 2008."[15]

Therefore, even if one ignored K.L's subsequent preliminary hearing and trial testimony stating that there were more than two incidents,[16] K.L. made no unequivocal statements definitively establishing that the "first" incident occurred in November 2007 and the "second" incident occurred in April 2008. For this reason, even if the defense established that Fritsche was on the road for the entirety of November 2007—which Amezcua did not say—that would not contradict *what the child actually said*. Moreover, even if the defense established that Fritsche was on the road, with no possible layovers in Sparks, for the entirety of April 2008—which is perhaps debatable—that also would not contradict *what the child actually said*.

---

[15]While Fritsche alleged that K.L. made such a statement to Nurse Cornell, the Court further notes that the record also does not reflect that K.L. made such a statement to Detective Patton. There is no such statement in the transcript of his single interview of K.L. Regardless of what Detective Patton may have been thinking when he wrote "4/08" on the authorization form, there is no statement *by the child* in the record that the last incident occurred in April 2008.

At the state court evidentiary hearing, defense counsel at one point accepted the premise posed by postconviction counsel that the child said to Nurse Cornell that the last incident was in April 2008. (ECF No. 15-16 at 46-47.) However, "*Strickland* . . . calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind," much less his state of mind and the accuracy of his recall over four years after trial. *Cf. Richter*, 562 U.S. at 109-10. Objectively, it is indisputable that the exhibit does not establish that K.L. told Nurse Cornell that the last incident occurred in April 2008. Objectively, had the defense sought to establish such a point at trial based upon the cited page from the exhibit, the prosecution easily would have cut through that canard, to the substantial detriment of the defense.

[16]In truth, given the additional acts and the time frame reported by K.L. to Nurse Cornell during her interview, it is arguable that K.L. was reporting more than only two incidents as early as the May 31, 2008 examination.

20

Such an effort by the defense thus would not establish a viable alibi, even if one were to assume that there were only two incidents. Nor would such an effort by the defense even call the child's credibility into question—as the effort would not establish that Fritsche was on the road at a time that contradicted what the child *actually* said. Attempting to challenge a nine-year-old child's credibility in such a patently ineffectual manner clearly would not have been a sound trial strategy.

Moreover, neither K.L's preliminary hearing testimony nor her trial testimony was confined either to only two incidents or to incidents necessarily occurring in only November 2007 and April 2008. Her actual testimony—which is what the defense ultimately had to deal with at trial, not only the initial police interview—spoke of a multitude of incidents that were not all confined within any two specific months within the July 3, 2007 through May 15, 2008 period alleged in the amended information. Even taken at face value as competent evidence, the materials tendered by Fritsche to the state courts regarding his work with Amezcua and Gartner did not at all tend to establish that he was elsewhere at all relevant times. Indeed, on their face, the materials reflect substantial gaps during this period when Fritsche was not even employed. An alibi defense based upon Fritsche being out on the road driving trucks would have had several large holes in it.

The question further arises as to how the defense would have sought to establish such a flawed, ineffectual alibi defense. Fritsche urges that defense counsel should have called one witness that had turned hostile to the defense and another witness that he himself had indicated—across multiple occasions—was "devious," "diabolical" and out to get him and frame him. In the best of circumstances, it is not sound trial strategy to put a witness on the stand that can hurt one's case. It especially is unsound strategy to put such a witness on the stand when the favorable testimony that one is seeking to elicit would be ineffectual even without any additional harmful content.

In this vein, Fritsche maintains that Joanne L. stated in an interview with Detective Fiore that "she did not see [K.L.] on March 11, 2008, and that Fritsche did not return to

the Reno/Sparks area until May, 2008" and further that "she was on the road with Fritsche for a few weeks in November and December 2007." (ECF No. 28 at 22-23.)[17] He contends that despite her alleged "hostility," "any testimony contrary to her statement would render her prior admissions admissible under Nevada law." (*Id.* at 22.) The problem for the defense, however, was not whether Joanne L. would provide equivalent testimony regarding, *e.g.*, when Fritsche was on the road, which as discussed previously, would not present a viable alibi defense in any event. The problem for the defense was what she would say about what happened *when Fritsche was in the house with K.L.* And the record reflects that what she did say to Detective Fiore was that Fritsche fell asleep in K.L.'s room on a night when Joanne L. "was adamant" that K.L. had been staying overnight. This would not establish a successful alibi defense.

Finally, if the defense had pursued such an inherently ineffectual alibi defense, including with a witness who very likely instead would have incriminated Fritsche, the State would have pointed to all of Fritsche's statements acknowledging that he had been in the house at times when K.L. stayed overnight. Fritsche did not say *that he was not there;* he said that he did not go in K.L.'s bedroom and sexually abuse her. (*See* ECF No. 15-16 at 171-72.) Fritsche's own words would have shredded anything left of an alibi defense at that point.

Under the objective standard required under *Strickland*, it was not unreasonable for a trial lawyer to not pursue a defense that would have been—as an understatement— so ill-advised. The state court's rejection of this claim clearly withstands scrutiny under the doubly deferential standard of review required under AEDPA, and indeed, it would have withstood even a *de novo* review.

///

---

[17]Fritsche cites to pages 12-14 and 40-42 of Exhibit 46. Exhibit 46 is an eight-page supplemental report by Detective Patton. (ECF No. 16-10.) Detective Patton did include a reference to Detective Fiore's interview of Joanne L., which is discussed *infra*. But Detective Patton did not discuss all of the interview, including the portions relied upon by Fritsche. It does not appear that Fritsche filed a transcript of the Joanne L. interview in the federal record, which would appear to have been a "mixed bag" for the defense.

Ground 1(a) does not provide a basis for federal habeas relief.[18]

## B.    Ground 1(b): Prior Inconsistent Statements

In Ground 1(b), Fritsche alleges that he was denied effective assistance when trial counsel allegedly failed to bring out several inconsistencies between the victim's out-of-court statements and her trial testimony. (ECF No. 13 at 13-15.)

### 1.    Relevant Background

The earlier detailed recital of the victim's statements and testimony serves as background also to this claim. (*See supra* Section III.A.) The Court briefly recaps the key changes in her account over time. The Court also notes additional testimony relevant to Fritsche's arguments on this claim.

During her initial May 15, 2008, interview with Detective Patton, K.L. said that Fritsche had "use[d] a vibrator and sometimes with his tongue," that she had not been counting but all she remembered was two incidents, and that she thought that the first incident was before Thanksgiving of the prior year but she did not know whether it was before Halloween. She further was uncertain as to specifically when the last incident occurred. (*See supra* Section III.A.)[19]

During her May 31, 2008 interview and examination by a nurse practitioner, K.L. referred additionally to Fritsche having her hold his penis, trying to put it in her mouth, suggesting that she swallow his semen, and ejaculating on the ground. The nurse's report

---

[18]Fritsche alleges in the reply that "[t]he indefinite nature of the Amended Information raises Fifth and Sixth Amendment concerns" and that "[b]y alleging a lengthy time period within which two discrete events occurred, the DA violated Fritsche's right to notice and to present a viable offense [sic]." (ECF No. 28 at 25-26 & n.3.) Fritsche may not allege a new claim for the first time in the reply, and no such claim properly is before the Court. *See, e.g.*, *Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994). The Court further would note that, while the State alleged two counts, the State and the witness no longer were alleging "two discrete events" by the time of trial. Trial counsel had to deal with the witness's anticipated trial testimony following upon her preliminary hearing testimony, not only the statement by the eight-year-old child in an initial police interview. Fritsche's continuing efforts to restrict the case that the defense actually faced at trial to only "two discrete events," disregarding the preliminary hearing and trial testimony, are unpersuasive.

[19]Fritsche's allegation that the child stated that the first incident occurred between Halloween and Thanksgiving misstates the record. (*See supra* Section III.A.)

23

did not reflect the number of incidents. The report reflected that the incidents started when K.L. was seven years old and that the last incident occurred approximately two weeks prior to the interview. (*See supra* Section III.A.)[20]

At the September 3, 2008 preliminary hearing, K.L. testified that Fritsche had visited her room with the vibrator "10 or 20" times but she did not remember specifically. She also testified to incidents in the living room and the grandmother's room when she was not there as well as in the sleeping cab of Fritsche's truck. She testified to a variety of types of incidents more or less within the range of types of incidents reported to the nurse. K.L. testified that the incidents started after her eighth birthday, in July 2007; and she could not recall what she told the detective about when the last incident occurred. (*See supra* Section III.A.)

At the March 2009 trial, K.L. testified substantially similarly to her preliminary hearing testimony, and her trial testimony thus similarly differed from her initial statement to Detective Patton. She testified to multiple incidents—"more than I can count" and "like 10 or 15 times"—with multiple different activities and locations generally along the lines of her preliminary hearing testimony. She did not identify any specific dates, including as to the dates of the first and last incidents. (*See supra* Section III.A.)

Early during the cross-examination of K.L., defense counsel asked K.L. multiple questions about her prior statements to Detective Patton:

Q      . . . . Do you remember telling him that it was just two times?

A      No.

Q      Okay. Do you remember that he asked you about when did it start?

A      I don't really remember.

Q      Okay. Do you remember saying to him that it was the beginning of this year, meaning '08?

---

[20]Fritsche's allegation that the report reflects that the child stated that the last incident occurred in April 2008 misstates the record. (*See supra* Section III.A.) Fritsche further maintains that K.L. told the nurse that Fritsche had touched her on two occasions. (ECF No. 13 at 13.) The nurse's report does not say anything one way or the other in that regard.

| | | |
|---|---|---|
| 1 | A | Yeah. |
| 2 | Q | Okay. And then did you remember him asking was it before Christmas? |
| 3 | A | Yeah. |
| 4 | Q | Okay. And what did you say to that, do you remember? |
| 5 | A | No. |
| 6 | Q | Okay. Well, do you remember him asking you if it was before Thanksgiving? |
| 7 | | |
| 8 | A | No. |
| 9 | Q | Okay. And then you remember saying to him, "Well, I kind of don't know"? |
| 10 | A | Yes. |
| 11 | Q | Okay. So you didn't really know, then, is that it? Don't be afraid to answer, Hon, nobody is going to hurt you. |
| 12 | | |
| 13 | | Are you hesitating because you just don't know? |
| 14 | A | I didn't understand that. |
| 15 | Q | Well, what Detective Patton was doing was trying to see when it started and when it ended? |
| 16 | A | Oh. |
| 17 | Q | Do you remember telling him that you just didn't know? |
| 18 | A | Kind of. |
| 19 | Q | Kind of, okay. So you did tell him that? |
| 20 | A | Yeah. |
| 21 | Q | Okay. Do you remember you followed that by saying it was a long, long, long, long, long way away. Do you remember saying that? No? |
| 22 | | |
| 23 | A | Kind of. |
| 24 | Q | Okay. Then he asked you when the last time it happened. Do you remember what you said then? |
| 25 | A | No, I do not remember what I said. |
| 26 | Q | Okay. Do you remember telling him that it was last week, meaning the week before your interview? |
| 27 | | |
| 28 | A | No. |
| | Q | Okay. Do you remember when school got out last – last summer? |

<table>
<tr><td>A</td><td>I remember getting out, but I don't remember what month or day.</td></tr>
</table>

(ECF No. 14-12 at 93-95.)

Defense counsel also inquired regarding, *inter alia*, K.L.'s preliminary hearing testimony:

<table>
<tr><td>Q</td><td>Do you remember saying at the preliminary hearing that there was only once in the truck, and once at Grandma's, and once in Grandma's bed?</td></tr>
<tr><td>A</td><td>I don't remember saying that I did it once in Grandma's bed, but I remember saying once in the truck and once in Grandma's house, yeah.</td></tr>
<tr><td>Q</td><td>Okay.</td></tr>
<tr><td>Q</td><td>Okay. So that's only three times.</td></tr>
<tr><td>A</td><td>Three times in what? I don't get it.</td></tr>
<tr><td>Q</td><td>Well, didn't you tell the Court in the preliminary hearing that it was 10 or 20 times?</td></tr>
<tr><td>A</td><td>Yeah.</td></tr>
<tr><td>Q</td><td>And here you said it was twice in the truck and 10 or 15 times in the bedroom?</td></tr>
<tr><td>A</td><td>Yes.</td></tr>
<tr><td>Q</td><td>Okay. So that's a lot different from three times; once in the truck once in Grandma's, and once in your bed, huh?</td></tr>
<tr><td>A</td><td>Yeah.</td></tr>
<tr><td>Q</td><td>Okay. But you don't know which?</td></tr>
<tr><td>A</td><td>Okay. I'm not getting it again. Which what?</td></tr>
</table>

(*Id.* at 101-02.)

After the defense cross, the prosecutor moved for the admission of K.L.'s entire interview with Detective Patton. She did so "based on Mr. Hylin's questioning of the witness suggesting that she's testifying differently today," his "allegation or charge of recently fabricated or change in testimony," and his "allegation that this child is coming up with new and different stuff." The prosecutor maintained: "He doesn't show it to her, ///

but he lays that bomb for the jury, so now they are sitting there thinking something is different." (ECF No. 14-12 at 104-07.)

Following extensive argument, the state district court denied the State's motion to admit a recording or transcript of the interview in evidence. The prosecutor stated that she would have Detective Patton read from the interview transcript during his testimony. (*Id.* at 108-21.)

During the detective's testimony, the prosecutor and the detective read extensively from the interview, similar in manner to a deposition being read at trial with the prosecutor asking the questions and the detective responding with K.L.'s answers. The same statements by K.L. quoted earlier in this order were read verbatim into the record at trial. (*Compare* ECF No. 16-8 at 3, 7-10 *with* ECF No. 14-13 at 12-16.) It therefore was brought out into the trial record, *inter alia*: (1) that K.L. referred to only two incidents when she spoke with Detective Patton; and (2) what she specifically said about when the first and last incidents occurred. (*See* ECF No. 14-13 at 11-19.)

Fritsche's claim in Ground 1(b) additionally is directed to K.L.'s testimony concerning the vibrator used in the offenses. K.L. testified at trial that "part was white and the squiggly part was—it glowed blue and the rest was see-through." She drew a picture of the vibrator that was admitted into evidence. (ECF No. 14-12 at 52-55; *see also id.* at 70-71, 99-100; ECF No. 14-13 at 16-19.) In contrast, a vibrator recovered from Fritsche's backpack during a search of his truck in June 2008 instead was described by Detective Patton as being pink. (*See* ECF No. 14-13 at 29-30, 44.) During cross-examination of Patton, defense counsel secured concessions that the vibrator recovered during the search did not match K.L.'s description and that the police did not find any vibrator matching K.L.'s description. (*Id.* at 97-99.) During earlier cross-examination of K.L., defense counsel further secured an acknowledgment from her that she had never seen the vibrator recovered in the search "in real life" prior to the trial. (ECF No. 14-12 at 102-03; *see also id.* at 22-23.)

///

In closing argument, defense counsel focused on "these inconsistencies in the State's case" from the very outset. (ECF No. 14-13 at 134.) The very first inconsistency noted by counsel was that the pink vibrator recovered in the search did not corroborate K.L.'s account, given that "[s]he didn't even recognize that one." (*Id.* at 134-35.) Counsel thereafter focused at length on the multiple inconsistencies between what K.L. said in her initial interview with Detective Patton and her later preliminary hearing and trial testimony. He noted in particular how she had expanded her account from only two incidents to many more incidents involving additional allegations in multiple additional locations. He maintained that these embellishments to her account potentially reflected that she was being subjected to suggestion and coaching by investigators or her grandmother. He suggested that the incidents either did not occur or instead involved someone else, such as K.L.'s uncle who lived with her grandmother. (*Id.*, at 136, 141-44, 146.)

### 2. Post-Conviction Proceedings

At the state postconviction evidentiary hearing, defense counsel testified that he had not reviewed the trial transcript from over four years before and that he was "at a bit of a loss" as to specifics. (ECF No. 15-16 at 97; *see also id.* at 93-96.) With regard to confronting K.L. further directly with her prior inconsistent statements, he testified, *inter alia*, that he felt that "I had what I needed to argue," that he was concerned about reinforcing testimony from the direct by repetition and giving the prosecution an opportunity to rehabilitate K.L. on redirect, and that "particularly with a child witness like she was oftentimes that sort of tactic can backfire on you." (*Id.* at 93-96.) Counsel spoke also in other contexts regarding K.L.'s overall apparent credibility as a witness for the State, describing her at one point as "almost, you know, your perfect naive little prosecution witness." (*See id.* at 70-72, 111-12, 115-17.)

The state appellate court rejected the ineffective-assistance claim presented to that court on the following grounds:

*Victim's inconsistent statements*

Fritsche claimed that counsel was ineffective for failing to bring out the inconsistencies between the victim's out-of-court statements and her

28

courtroom testimony. However, the district court found that counsel testified credibly that the victim was a strong witness for the State, he had to be careful with his cross-examination to avoid jury backlash, and he carefully considered his cross-examination style as part of his trial strategy. The record supports the district court's findings and we conclude that Fritsche failed to demonstrate that counsel's performance was deficient in this regard. *See Silva v. Woodford*, 279 F.3d 825, 852 (9th Cir.2002) (concluding that counsel's limited cross-examination of an adverse witness was reasonable because a more forceful cross-examination could have made the witness more sympathetic in the eyes of the jury).

(ECF No. 16-2 at 4.)

### 3. Analysis

The state court's rejection of this claim was not an objectively unreasonable application of *Strickland*'s performance prong.

Fritsche urges that "[c]ounsel did not impeach [K.L.] with the actual statements," did not ask Nurse Cornell "regarding [K.L.'s] prior out-of-court statements," did not "ask Detective Patton about [her] inconsistent out-of-court statements," "did not confront [K.L.] about her memory could be better at trial than it was when she made her original statements approximately nine months [before]," and "failed to effectively argue the significance of these inconsistencies." He argues that "it is critical that defense counsel reveals inconsistencies in the complaining witness's statements" and that "[t]his trial counsel failed to do." (ECF No. 13 at 14-15.)

What the trial record instead clearly establishes, however, is that defense counsel did cross-examine the child witness regarding prior inconsistencies, that counsel thereby effectively made the point that the child's story had changed over time, that this cross-examination led to the prior inconsistent statements being made of record—verbatim—during Detective Patton's testimony, and that counsel strenuously argued during closing argument that the inconsistencies in the child's account created a reasonable doubt as to guilt.[21]

///

---

[21]Fritsche does not identify any specific prior inconsistent statements in K.L.'s statements to Nurse Cornell that would have been more powerful than the prior inconsistent statements from her interview with Detective Patton that were read verbatim into the trial record during his testimony.

Fritsche's argument that trial counsel failed to reveal inconsistencies in the complaining witness' statements therefore is refuted by the trial record. Especially against that backdrop, the state court's determination that trial counsel did not provide deficient performance by not cross-examining K.L. more forcefully on the inconsistencies was not an objectively unreasonable application of the performance prong of *Strickland*. Counsel's efforts led to the prior inconsistent statements being made of record verbatim, and he provided extensive argument based upon the inconsistencies in his closing. Particularly given that counsel was able to get what he needed to argue the point via other means, his decision as to how hard to press a nine-year-old child further during cross-examination is a classic trial strategy decision that is "virtually unchallengeable." *Cf. Strickland*, 466 U.S. at 690.

Fritsche further urges that defense counsel "failed to explore" with one exception unspecified "other inconsistencies." The only specific example given is that K.L. "stated at trial that the vibrator Fritsche allegedly used on her was blue with a clear background" but "[i]n reality, the vibrator seized and tested by law enforcement was pink." (ECF No. 13 at 14.) The trial record directly refutes this argument as well. Trial counsel did in fact explore this inconsistency at trial, and it was the very first inconsistency that he focused on in his closing argument.

The state court's rejection of the ineffective-assistance claim presented in Ground 1(b)—a claim that is directly refuted by the trial record on multiple critical points—was neither contrary to nor an unreasonable application of *Strickland*.

Ground 1(b) does not provide a basis for habeas relief.[22]

---

[22]Fritsche also contends that counsel failed to effectively argue the significance of an alleged inconsistency in K.L.'s preliminary hearing testimony. He asserts that she testified that, in Fritsche's truck, he ejaculated "'clearish' fluid that flew up so high on a shelf that she couldn't see it." (ECF No. 13 at 15.) In this regard, Fritsche maintains that: (1) the truck was gone by the time of K.L.'s preliminary hearing testimony and therefore no longer could be tested for biological evidence; (2) "[b]ecause trial counsel did not explore the truck story inconsistencies with [K.L.], he lost the opportunity to point out the outlandish aspects of her flying semen story;" and (3) "[n]or could defense counsel stress the lost opportunity to verify or disprove the presence of semen on the truck's shelf." (*Id.*)

As backdrop, Fritsche drove a truck, or "tractor," with a sleeper cab; and K.L.'s grandmother went on the road with Fritsche. K.L. referred to what she called a "couch"

## C.    Ground 1(c): Denial of Guilt

In Ground 1(c), Fritsche alleges that he was denied effective assistance when trial counsel failed to follow the trial court's guidance as to the manner of eliciting the fact that Fritsche denied culpability. (ECF No. 13 at 15-17.)

### 1.    Relevant Background

During Detective Patton's direct examination, the State elicited testimony as to the inconsistencies and changes in Fritsche's statements over the course of his June 13, 2008 police interview. (ECF No. 14-13 at 31-48.) Included therein were statements by Fritsche denying being alone with K.L. (*Id.* at 38.)

During cross-examination, the trial court sustained the State's hearsay objection when defense counsel asked Patton: "Charlie Fritsche never claimed ownership of that vibrator, did he?" The State again raised a hearsay objection when counsel later asked, within a series of questions regarding Fritsche being cooperative with the police: "Gave you permission to search his house, truck and stated to you, 'I have nothing to hide.'"

---

that was underneath "my grandma's bed" that could lift up. (*See* ECF No. 14-5 at 34-36.) K.L. testified, in her child's terminology, that Fritsche ejaculated in the truck, when she "was sitting on a bed, on a little couch under the big bed." (*Id.* at 30.) During the preliminary hearing, but not at trial, the prosecutor asked where the ejaculate went. K.L. responded: "I couldn't see most of it, after it went up there, because it was like clearish, so I couldn't see it when it went up high." (*Id.*) The prosecutor asked the question again, noting that K.L. had pointed to the sky. K.L. responded: "I think it was just like on the—on a shelf that he had, a shelf in there. I don't remember." When the prosecutor asked whether it went "above your head somewhere," she responded "no." (*Id.* at 31.)

There is no viable argument that counsel was deficient for not seeking to bring this prior testimony out into the trial record to then seek to discount it as "outlandish." Fritsche asserts that the child testified that the ejaculate "flew up so high on a shelf that she couldn't see it." However, the child was vision-impaired. (*See* supra note 3.) Her statement that "I couldn't see it when it went up high" thus does not necessarily establish that the semen flew some "outlandish" distance before passing out of her field of view in the lighting at the time. Nor was the distance to the shelf established. It was not established that the shelf was a great distance away as opposed to simply shelving within the sleeper cubbyhole for the lower bunk or "couch." Nor did K.L. definitively remember whether the semen landed on the shelf in the first instance. Counsel therefore would have been bringing out further adverse testimony from the prior proceeding all in an effort to take a nine-year-old girl to task about how "outlandish" her testimony had been about ejaculated semen flying out of her limited field of view. Ridiculing a young girl with a disability before a jury concerning an issue directly related to her disability has little to commend itself as an effective cross-examination strategy. Doing that merely to make the tangential point that the defense did not have an opportunity to test the truck has even less to commend itself as an effective trial strategy.

(ECF No. 14-13 at 53.) This objection spawned an extensive argument mostly outside the presence of the jury, spanning over forty pages in the trial transcript. (*Id.* at 53-94.) The State's hearsay objection to the pending question was sustained as well as to a question asking: "Not saying what a specific witness said, he never made any confessions about any behavior that he was accused of . . . ." (*Id.* at 61.)

The trial court ultimately ruled that defense counsel could inquire only within the context of the specific areas covered on direct whether Fritsche had indicated or agreed that he engaged in the charged behavior. However, the court would not permit counsel to ask more broadly: "He never made any statement whatsoever where he admitted that he engaged in this behavior sexually?" (ECF No. 14-13 at 75-81, 83, 85, 88-89.)

Defense counsel in turn ultimately stated:

> MR. HYLIN: . . . . I'm not going to ask anything about the transcript. I'm going to move on but I don't want this to be interpreted as an abandonment of my objection for not being able to ask about non-hearsay questions.

(*Id.* at 92.)

Near the conclusion of the defense closing argument, counsel argued, without objection from the State:

> Let me talk about what wasn't said. There's several inconsistencies that the prosecution put up on the screen there that would have you believe that, collectively, he's just the biggest liar in the world. If you ask him what time it was you should check your own watch. There's no evidence of true lies here. As a matter of fact, what you need to focus on—what Detective Patton didn't get in that interview and what was not talked about by the prosecutor—is that man never once talked in terms of his guilt. He never, ever said that Detective Patton, "Yeah, I did some of those acts on [K.L.]." It's not there, of course, that's why there's this dance around it with the inconsistency that the prosecution talks about because there isn't anything there that Charlie Fritsche said during that interview with Detective Patton where he admitted guilt. He said nothing of that sort. You bet it would be here in neon signs blinking at you if he would have said anything that he performed sex acts on [K.L.] that he's accused of doing.

(*Id.* at 145-46.)

On direct appeal, the Supreme Court of Nevada rejected the related claim presented to that court on the following basis:

> Appellant Charles Ben Fritsche claims that the district court committed reversible error when it precluded a State's witness from stating that

Fritsche did not confess. We disagree. When Fritsche attempted to elicit testimony on this non-confession from the detective who had interviewed him, the State objected on hearsay grounds and the district court sustained the objection. Fritsche claims that his improper question left the jury with the impression that he may have confessed, an impression he was not allowed to correct. But after extended argument outside the presence of the jury, the district court assisted Fritsche in fashioning an unobjectionable question and overruled the State's objection to the new question. Fritsche, however, never asked it. We conclude it was not an abuse of discretion for the district court to exclude the non-confession testimony under the circumstances of this case. *See Hernandez v. State*, 124 Nev. 60, ——, 188 P.3d 1126, 1131 (2008).

(ECF No. 15-9 at 2.)

### 2. Post-Conviction Proceedings

At the state postconviction evidentiary hearing, defense counsel testified that he did not ask the district court's questions because: (1) he believed that he had strong issue on appeal based upon the rule of completeness due to the district court's refusal to allow him to ask the more broad-based question that Fritsche categorically denied having committed the crimes throughout the interview (ECF No. 15-16 at 76-79, 85); (2) he believed that the court formulating the questions that the defense could ask violated due process, particularly with the district court's questions being, in his opinion, convoluted and complex, without any followup questions formulated (*id.* at 79-84, 113-14); (3) he did not want to waive the issue on appeal by asking the court's questions (*id.* at 79-80, 113-14); and (4) he could make the point during closing argument (*id.* at 84).

On the state postconviction appeal, the state appellate court rejected the claim presented to that court on the following basis:

Fritsche claimed that counsel was ineffective . . . for failing to present evidence that he consistently denied culpability.

The district court found . . . that counsel attempted to present evidence that Fritsche consistently denied culpability through his cross-examination of a police detective. However, the prosecutor objected to counsel's questions and the trial court rejected counsel's doctrine-of-completeness argument. And when the trial court suggested questions that could be asked, counsel chose not to ask them because he believed that it was unlawful for a court to formulate questions on Fritsche's behalf, he felt that the doctrine of completeness had been violated, and he sought to preserve these issues for appellate review. The district court further found that . . . counsel's decision to not ask the trial court's suggested questions was a tactical decision.

33

> The record supports the district court's findings. We conclude that counsel's performance was not deficient. Counsel made a tactical choice to forego asking the trial court's questions and, while this choice may not have been the best option, it was reasonable and did not place counsel's representation "outside the wide range of professionally competent assistance." *See Strickland*, 466 U.S. at 690.

(ECF No. 16-2, at 5.)

### 3. Analysis

Under the doubly deferential standard of review required under AEDPA, the state appellate court did not unreasonably apply *Strickland*'s performance prong. As noted previously, *Richter* instructs that under that required doubly deferential standard of review, "[t]he question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105.

The Nevada appellate court's decision was based upon a reasonable argument that defense counsel satisfied *Strickland's* deferential performance standard. During *Strickland*'s discussion of performance, the Supreme Court refers at multiple points to "the range of legitimate decisions regarding how best to represent a criminal defendant" to "take account of the variety of circumstances faced by defense counsel," "the wide latitude counsel must have in making tactical decisions," the "countless ways to provide effective assistance in any given case" as "[e]ven the best criminal defense attorneys would not defend a particular client in the same way," and the "wide range of professionally competent assistance." 466 U.S. at 688-90. *Strickland* establishes "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" such that "the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting prior authority). Given that strong presumption, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690. Against the backdrop of this highly deferential standard, the Nevada appellate court's conclusion that counsel's decision to attempt to instead preserve the issue for appeal fell within the wide range of reasonable professional

///

1   assistance was not an objectively unreasonable application of *Strickland's* performance

2   prong.

3          Fritsche insists that defense counsel's decision was unreasonable because the

4   state district court ruled that he "could ask the detective 'isn't it true' questions such as

5   'isn't it true that [Fritsche] denied the behavior that you accused him [of during the

6   interrogation]," citing to ECF No. 14-13 at 77-78. (ECF No. 28 at 33 (alterations in

7   original).) Fritsche again misstates the record.  The state district court did not permit

8   defense counsel to ask a simple and direct blanket question that "isn't it true that Fritsche

9   denied the behavior that you accused him of during the interrogation," either at the cited

10  point in the record or at any other point in the forty pages of argument.

11          In the passage cited by Fritsche, the state district court instead said that he could

12  ask: "You have heard all of the discussions that the State asked you about, those various

13  discussions that you had with my client. During those discussions isn't it true that he

14  denied the behavior that you accused him in those discussions?" (ECF No. 14-13 at

15  77-78.) The court thereafter elaborated, repeatedly, that defense counsel could use this

16  form of question only within the context of the six specific areas of alleged inconsistent

17  statements covered in the State's direct. (*Id.* at 77-80.)

18          Defense counsel stated that he was "going to do it exactly like you told me to" and

19  ask, after a preface: "It's a fact that he denied the behavior with which he's now charged."

20  (*Id.* at 80.)

21          The court stated immediately: "No. That's not what I said. No." (*Id.* at 80.) The

22  judge then reiterated that defense counsel could inquire only within the six areas of

23  inconsistency covered in the State's direct. She then made the direct statement: "You

24  can't just say throughout the interview he denied everything. You have to go on her

25  Direct." (*Id.* at 80-81.) In the remainder of the argument, the court never ruled that the

26  defense could ask a simple and direct blanket question as to whether Fritsche denied the

27  ///

28  ///

behavior during the interview, separate and apart from the six areas of direct inquiry. (*Id.* at 81-93.)[23]

Fritsche's statement to this Court that the trial judge said defense counsel "could ask the detective 'isn't it true' questions such as 'isn't it true that [Fritsche] denied the behavior that you accused him [of during the interrogation]'" thus misstates the record. The trial judge emphatically and repeatedly stated that she would *not* permit such a blanket question.

Fritsche further urges that defense counsel's "belief that he had to forego cross-examination to preserve the issue for appeal is wrong as a matter of Nevada law." (ECF No. 28 at 36.) The case upon which he relies, *Pineda v. State*, 88 P.3d 827 (Nev. 2004), is not on point, however. In *Pineda*, the state supreme court declined to follow *Ohler v. United States*, 529 U.S. 753 (2000), and held that a defendant did not waive the ability to challenge a pretrial ruling denying a motion in limine to exclude his prior convictions by thereafter anticipatorily eliciting testimony regarding the convictions during direct examination of the defendant. 88 P.3d at 830-31. Fritsche cites no apposite Nevada authority definitively establishing for defense counsel at the time of the 2009 trial that the state supreme court would hold that a party would not waive a challenge to an in-trial limitation on cross-examination by posing alternative questions framed by the trial judge. Absent such apposite authority, Fritsche cannot establish that defense counsel's assessment of the situation in 2009 necessarily was wrong as a matter of Nevada law.

Fritsche otherwise relies upon multiple federal circuit decisions that he maintains supports his claim. It is long-established law, however, that a petitioner must demonstrate that the state appellate court unreasonably applied law clearly established by United States Supreme Court precedent, not federal circuit decisions. *E.g., Glebe v. Frost*, 135 S. Ct. 429, 431 (2014). The state appellate court in this case did not unreasonably apply the deferential performance standard in *Strickland.*

---

[23](*E.g.*, ECF No. 14-13 at 85 ("You can go into those [six] areas and say, 'Isn't it true he denied it?' But you can't come in and say, 'Now you had a four-hour interview with him. Isn't it true he never made a confession? He denied everything because . . . .'").)

Ground 1(c) does not provide a basis for habeas relief.

### D. Ground 1(d): Alleged Prosecutorial Misconduct

In Ground 1(d), Fritsche alleges that he was denied effective assistance when trial counsel did not object to alleged prosecutorial misconduct when the prosecutor: (i) told K.L. to "grab the microphone in your hand like you're a famous singer on T.V.;" (ii) repeatedly called K.L. "honey;" (iii) made statements such as "Honey, don't be ashamed okay? Does this make you feel bad to talk about?"; (iv) argued in closing that K.L. had been "revictimized" by having to testify about anatomy; (v) argued that K.L. cried on the stand, had to be subjected to cross-examination, and "had to go through this now for almost a year;" (vi) referred, *inter alia*, to defense counsel "viciously defending" his client; and (vii) at the end of her argument implored the jury: "Do not let this little girl be the perfect victim." (ECF No. 13 at 17.)

### 1. Relevant Background

At the preliminary hearing, K.L. initially spoke very softly. She thereafter broke down during early testimony regarding her private anatomy. (ECF No. 14-5 at 6-10, 14-17.)

At trial, it was the trial judge who first suggested to a child witness, K.L.'s friend H.H., that "[i]t's kind of like American Idol, okay, because everybody has to hear what you have to say" as the bailiff was handing her the microphone. (ECF No. 14-10 at 18.)

When K.L. later testified, the prosecutor said to her at the outset that "I'm going to ask you to grab the microphone in your hand like you're a famous singer on TV, okay?" (ECF No. 14-12 at 36.) She had to encourage K.L. to speak louder thereafter. (*Id.* at 37.)

K.L. broke down again during her trial testimony, again when it came to talking about her private anatomy, leading to the prosecutor addressing her as "Honey" for the first time. (*Id.* at 45.) The prosecutor thereafter addressed K.L. as "Honey" three more times over the course of her forty-five pages of direct testimony—with one exception at points where it appeared that K.L. was having emotional difficulty with the subject of her testimony. (*Id.* at 50, 56, 59.)

On cross-examination, defense counsel also addressed K.L. as "Honey" on one occasion after the trial judge asked her again to speak up. He later said to her: "Hon, nobody is going to hurt you," and he asked her "Are you all right" when she broke down again later during her testimony. (*Id.* at 93-94, 98.)

The prosecutor thereafter addressed her as "Honey" once on redirect. (*Id.* at 123.)

The prosecutor's closing argument included the following remarks, at two different points sequentially over the course of the closing:

> "Charlie licked my pussy. He put a vibrator on my pussy." This wasn't something comfortable that she wanted to talk about. Don't you recall when we were going through the diagram when we were naming the body parts, it's a difficult task and I re-victimize her by taking her on the stand, in order to do that I have to prove the case to you. I apologize if it bothers you that we have to go through that with you. She was fine with the hair, the eyes, her nose, everything, until we got to the vagina and what did you see? She cried. We had to move on. We had to come back to that. She sat there and sobbed in the arms of the advocate sitting next to her at the mention or thought of having to discuss the word "pussy."

> . . . . .

> Proof that he committed Count II. Again, [K.L.] says it happened. The testimony of one witness is sufficient to prove a fact if you believe it. She described she pulled her pants down. She described she pulled her underwear down. She said it happened on the bed in her room, the same place where he performed oral sex with her. She was consistent and she has no motive to lie. Think about that. There's no reason for this little girl to come into this courtroom and tell you this didn't happen if it didn't. [K.L.] knows things that she shouldn't know. She knows the word "pussy." She knows what a vibrator is. She knows the sound a vibrator makes. She knows it feels good on her vagina. She knows clear stuff comes out of Defendant. She shouldn't know the vibrator made it tickle. She shouldn't know these things but she does. She does because he committed these crimes. This little girl has absolutely no motive to lie. She cried on the stand. She's had to be subjected to Cross-Examination. She had to go through this now for almost a year. She has no motive to lie. This criminal Defendant cannot say the same.

(ECF No. 14-13 at 117, 127.)

The prosecutor stated, *inter alia*, the following thereafter in her rebuttal argument:

> Now, Justin's testimony, and if you were listening carefully, was they started going out on the truck route in August of 2007. There's six weeks or months before she turned eight, then he was unemployed, and February where he was home—not to mention all the times they came back every few weeks for a few days. There was opportunity. To say there was no opportunity, there's no evidence of that. The facts are made up that somebody suggested something to this child. Trust me, folks, this defense attorney— you saw her fighting here in court. He is viciously defending his client. Had

38

he thought for one second there was one evidence of suggestibility significant in this case he would have filed a motion and this Judge would have struck the evidence. That wasn't done. You heard that child testify. There's no evidence of that. Put it right out of your minds.

(*Id.* at 149-50.)

She closed the rebuttal with the following:

Do not let this little girl be the perfect victim. You either believe [K.L.] or you don't. That's what this boils down to. Believe her and convict him.

(*Id.* at 156-57.)

## 2. Post-Conviction Proceedings

At the state postconviction evidentiary hearing, defense counsel testified, *inter alia*: (1) that the prosecutor "was maternalistic throughout the whole trial toward [K.L.]" but he "had to make a decision whether I wanted to take a chance on offending the jury by standing up and saying, Your Honor, I can't stand the way the prosecutor is treating this little girl;" (2) that, while he could have objected to her closing remarks, he stated that what the "very crafty" prosecutor, who he had tried numerous cases against, "did was put me in a position where [she said that] he is very viciously defending the client" such that if he then objected to that remark during her argument he simply would reinforce the impression that he was "the vicious oppressor of [K.L.]," "[s]o those things have to be handled very delicately; and (3) in response to examination by the State, that he was not aware of any Nevada authority precluding a prosecutor from calling a victim "honey." (ECF No. 15-16 at 104-05, 107-08, 118-19.)

On the state postconviction appeal, the state appellate court rejected the claim presented to that court on the following basis:

*Prosecutorial misconduct*

Fritsche claimed that counsel was ineffective for failing to object to pervasive prosecutorial misconduct. Fritsche asserted that the prosecutor committed misconduct when she (1) told the victim to "grab the microphone in your hand like you're a famous singer on TV;" (2) asked the victim, "are you okay? Just take a minute, Honey" when the victim described her vaginal area; (3) repeatedly called the victim "Honey;" (4) stated, "Honey, don't be ashamed, okay? Does this make you feel bad to talk about" during the victim's direct testimony; (5) argued to the jury that she "victimized" the victim by having her testify to body parts; (6) argued that the victim "cried on the stand" because she had to be subjected to cross-examination and

39

that "she's had to go through this now for almost a year;" (7) argued, "Trust me, folks, this defense attorney—you saw him fighting here in court. He is viciously defending his client;" and (8) closed with, "Do not let this little girl be the perfect victim." Fritsche argued this misconduct deprived him a fair trial because the prosecutor made it sound like he victimized the victim by demanding a trial and her maternalistic style created sympathy for the victim.

Although the prosecutor's comments may have constituted misconduct, the district court found that counsel made strategic decisions as to when to interpose objections to the prosecutor's questions and arguments and that Fritsche failed to prove that counsel's performance was deficient and fell below an objective standard of reasonableness in light of the circumstances associated with this case. The record supports the district court's findings and we conclude that Fritsche failed to demonstrate that counsel's performance was deficient in this regard. *See Bussard v. Lockhart*, 32 F.3d 322, 324 (8th Cir.1994) (observing that counsel's decision to object to prosecutorial misconduct is a strategic decision which "must take into account the possibility that the court will overrule it and that the objection will either antagonize the jury or underscore the prosecutor's words in their minds").

(ECF No. 16-2 at 5-7.)

### 3.    Analysis

The state appellate court's rejection of this claim was not an objectively unreasonable application of *Strickland*'s performance prong. The Court is not persuaded by Fritsche's arguments seeking to establish to the contrary.

At the outset, Fritsche maintains—in the reply—that "[h]ad trial counsel objected to, and then appealed, the misconduct there is a reasonable probability that the jury would have acquitted or, even more likely, the Nevada Supreme Court would have reversed his convictions." (ECF No. 28 at 37.) He asserts that "[d]efense counsel Hylin served as Fritsche's trial and appellate counsel" and that Fritsche preserved the right in his state postconviction appeal brief "to argue Hylin was ineffective in either, or both roles." (*Id.* at 37 n.1.) He thereafter urges in the reply that Respondents fail to appreciate the path to finding prejudice consisting of "whether preserving the error and raising the issue on appeal would have likely resulted in reversal." (*Id.* at 39.)

There are two fundamental flaws with this reply argument.

First, Fritsche alleged no claim of ineffective assistance of appellate counsel in the first amended petition, including in particular in Ground 1(d). (*See* ECF No. 13 at 17-18.)

Whatever Fritsche may or may not have preserved on his state postconviction appeal is irrelevant. Federal habeas pleading is not notice pleading, and Fritsche alleged no claim of ineffective assistance of appellate counsel in the federal pleading. A petitioner may not raise a claim for the first time in the reply. *See, e.g.*, *Cacoperdo*, 37 F.3d at 507. There is no such claim of ineffective assistance of appellate counsel before this Court.

Second, Carl Hylin was *not* direct appeal counsel. John Petty instead represented Fritsche on direct appeal. (ECF No. 15-6.)

Fritsche in any event maintains that Hylin—as trial counsel—failed to preserve a meritorious objection to alleged prosecutorial misconduct that would have resulted in, *inter alia*, a reversal on direct appeal.

On an underlying substantive claim of alleged prosecutorial misconduct, it is critical to distinguish between the standards applied by the federal courts in the exercise of their supervisory power in federal criminal trials and the federal constitutional standard. On federal habeas review of a state court conviction for constitutional error, the standard of review for a claim of prosecutorial misconduct, is "'the narrow one of due process, and not the broad exercise of supervisory power'" applied in federal criminal trials. *See, e.g.*, *Darden v. Wainwright*, 477 U.S. 168, 181 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)). Under the narrower due process standard, "[t]he relevant question is whether the [alleged misconduct] 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.* (quoting *Donnelly*, 416 U.S. at 643); *accord Duckett v. Godinez*, 67 F.3d 734, 743 (9th Cir. 1995).

In the reply, Fritsche initially references the federal constitutional standard in *Darden*. (ECF No. 28 at 39.) However, he then relies extensively on federal criminal cases addressing prosecutorial conduct not as a matter of federal constitutional law but instead pursuant to the broad exercise of supervisory power applied in federal criminal trials.

///

///

///

41

Fritsche essentially states the constitutional standard and then in the main argues the issue under federal criminal supervisory power case law. (*See id.* at 40-44.)[24]

Fritsche's argument—first stating the constitutional standard but then relying extensively on federal criminal cases applying supervisory authority to flesh out his argument—is not persuasive. The supervisory authority cases do not establish that the prosecutor violated the federal *constitutional* standard, which is the only one applicable to the states. The supervisory authority cases further do not establish that Fritsche would have been able to obtain a reversal under Nevada state law if an objection had been made. Fritsche cites no Nevada state cases that would have required reversal on the record presented with a timely objection. Fritsche has the burden of persuasion on federal habeas review, and an argument such as this does not carry that burden.

Fritsche otherwise does not cite any apposite constitutional decisions by the Supreme Court—which are the only decisions binding on the Nevada state courts on such an issue—that would have required reversal on the facts presented in this case upon a preserved defense objection.[25] In this regard, in assessing whether a state court's

---

[24]The cases relied upon by Fritsche that were decided instead pursuant to the exercise of supervisory power, without making a constitutional holding on the issue, include, in the order cited: *United States v. Young*, 470 U.S. 1, 19 (1985); *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996); *United States v. Conrad*, 320 F.3d 851, 855-56 (8th Cir. 2003); *United States v. Hands*, 184 F.3d 1322, 1334 (11th Cir. 1999); *United States v. Leon-Reyes*, 177 F.3d 816, 821-23 (9th Cir. 1999) (denying relief); *United States v. Necoechea*, 986 F.3d 1273, 1276-81 (9th Cir. 1993)(denying relief); *United States v. McKoy*, 771 F.2d 1207, 1209-13 (9th Cir. 1985); *United States v. Friedman*, 909 F.2d 705, 709-10 (2d Cir. 1990); *United States v. Pungitore,* 910 F.2d 1084, 1141-44 (3rd Cir. 1990); *United States v. Wilkerson*, 411 F.3d 1, 7-9 (1st Cir. 2005) (denying relief). Fritsche otherwise invokes what plainly are standards from supervisory authority case law rather than constitutional doctrine. *See, e.g.*, *United States v. Kojayan*, 8 F.3d 1315, 1323 (9th Cir. 1993) (referring to the lead supervisory authority case in *Berger v. United States*, 295 U.S. 78, 88 (1935)).

[25]The cases upon which Fritsche relies are far afield from the facts of the present case. *See, e.g.*, *Giglio v. United States*, 405 U.S. 150, 154 (1972) (failure to disclose deal with prosecution witness); *Viereck v. United States*, 318 U.S. 236, 247-48 (1943) (extensive appeal to patriotism and duty of jurors as American citizens, after stating that the enemy was "plotting your death and my death," in the midst of World War II); *Sandoval v. Calderon*, 241 F.3d 765, 775-80 (9th Cir. 2001) (in a capital murder trial, the prosecutor violated Eighth Amendment requirements governing the imposition of the death penalty when he argued, extensively, to the jury that the death penalty was sanctioned by God and that jurors would be "doing what God says").

express or implicit rejection of a claim under the general due process standard was objectively unreasonable:

> The meaning of "unreasonable" can depend in part on the specificity of the relevant legal rule. If a rule is specific, the range of reasonable judgment may be narrow. Applications of the rule may be plainly correct or incorrect. Other rules are more general, and their meaning must emerge in application over time. The more general the rule, the more leeway courts have in reaching outcomes in case by case determinations.

*Yarborough v. Alvarado*, 541 U.S. 652, (2004).

Further to the point, while Fritsche focuses his argument on Ground 1(d) on *Strickland*'s prejudice prong, the Nevada appellate court rejected the claim under *Strickland*'s performance prong. The court found that counsel did not render deficient performance when he opted to not object to the prosecutor's actions and remarks as a matter of trial strategy. The Court is not persuaded, including after considering Fritsche's reply argument, that the state court's decision constituted an unreasonable application of *Strickland*'s performance prong under the required doubly deferential standard of review.

The Supreme Court reiterated in *Richter* that federal habeas corpus is a guard against "'extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." 562 U.S. at 102-03 (quoting prior authority). The Court is not persuaded that a prosecutor telling a child witness "to grab the microphone like a famous singer on TV" and addressing her as "Honey" a handful of times, primarily when she had spoken softly and struggled emotionally during her testimony, presents such an extreme malfunction in the state criminal justice system. Nor is the Court persuaded that the prosecutor's closing remarks, even if perhaps at times potentially subject to an at least arguable objection, led to such an extreme malfunction in this case.

Ground 1(d) does not provide a basis for relief.

///

///

///

43

**E.      Ground 1(e): Alleged Lesser-Included Offense Instruction**

In Ground 1(e), Fritsche alleges that he was denied effective assistance when trial counsel did not request a jury instruction for statutory sexual seduction, which does not require lack of consent, as an alleged lesser-included offense. (ECF No. 13 at 18-20.)

**1.      Relevant Background**

The then nine-year-old K.L. testified at trial that what Fritsche did felt good at the time. She testified that she did not know that what he was doing was illegal until her older friend H.H. told her that it was. (ECF No. 14-12 at 59-60; *see also* ECF No. 14-10 at 19 (regarding H.H.'s age and grade).) Her prior similar statements to Detective Patton were not made a part of the trial record. (See ECF No. 16-8 at 12, 15-16.)[26]

Jury Instruction No. 14 defined sexual assault as follows:

> A person who
>   1. knowingly and willfully
>   2. subjects another person
>   3. to sexual penetration
>   4. against the will of the victim or
>   5. under conditions in which he knows or should know the victim is mentally or physically incapable of resisting or understanding the nature of his conduct
> is guilty of committing the crime of SEXUAL ASSAULT.

(ECF No. 15-2 at 16.)

Jury Instruction No. 20 stated as follows regarding conduct being against the victim's will:

> To determine if a crime is against the victim's will, you may consider, among other factors, the relationship between the perpetrator and the victim, the child's age, the child's maturity level, whether the child understands the nature of the conduct.

(*Id.* at 22.)

---

[26]During the initial police interview, Detective Patton asked K.L. how she felt at the time of the incidents. She responded: "Kinda good, kinda good, I mean like good, good, good, good." When he asked her what she meant by that, she responded: "Um like really, really, really good. That's what I mean." She affirmed that she liked it at the time. (*See id.*; *see also* ECF No. 15-16 at 116-17 (trial counsel imitating K.L.'s emphatic inflection from the interview video at the postconviction evidentiary hearing).)

## 2.    Post-Conviction Proceedings

At the state postconviction evidentiary hearing, defense counsel testified, *inter alia*, as follows:

> Q    Okay, did it occur to you as a matter of strategy that wait a minute, what [K.L.] is actually describing is stat sex, not describing sexual assault, she is not saying at the time of the penetration that it was against her will. Did that thought occur to you?
>
> A    Well, oh, sure it occurred to me. It occurs all the time when you get cases like this in here and there is not a protest or any behavior on the part of the alleged victim that indicates that they don't like or completely disagree with what this person is doing to them. That's, I understand that didn't occur in this case, but the District Attorney brings cases many, many cases every year we have them throughout the office and throughout our legal profession of sexual acts on younger children that are less than 14 years old, and the theory is that that is posited by the State for the lack of consent is that they are too young to consent.
>
> Q    Okay, but that's really a factual call, correct? I mean –
>
> A    Well, at some point it becomes a legal call.
>
> Q    It's always a legal call.
>
> A    I don't know where that line is.

(ECF No. 15-16 at 102-03.)

The State later asked defense counsel what he thought "about the suggestion of statutory sexual seduction as a lesser included when the victim is eight years old." He responded: "Frivolous." (*Id.* at 115.) During that discussion, counsel testified regarding K.L.'s "good, good, good, good" response to Detective Patton on the interview video. He remarked at the conclusion of this discussion:

> It was just a remarkable response to the point where I don't mean to infer anything other than this, but it made me wonder whether eight-year-old girls are actually capable of achieving an orgasm, because she expressed it that way, you know, it was obviously some pretty remarkable feelings that she had when these things were going on. *Well what does that do, it impresses to the jury that these are actual events, this is not something that is manufactured in a child's mind. You know that was a reaction to actual events. So I didn't want it in front of the jury anyway.*

45

(*Id.* at 116-17 (emphasis added).)

Counsel made this remark in context of the trial over four years earlier where he maintained throughout that the events *did not occur*, that Fritsche did not in fact engage in the behavior testified to by K.L.

On the state postconviction appeal, the state appellate court rejected the claim presented to that court on the following basis:

> *Jury Instruction*
>
> Fritsche claimed that counsel was ineffective for failing to seek a jury instruction on the lesser-included offense of statutory sexual seduction because the victim testified that sexual activity felt good. The district court found that counsel considered the concept of statutory seduction but rejected it because the victim was eight years old and not competent to give consent. The record supports the district court's findings and we conclude that Fritsche failed to demonstrate that counsel's performance was deficient in this regard. *See Means v. State*, 120 Nev. 1001, 1012, 103 P.3d 25, 33 (2004) (petitioner bears the burden of proving ineffective assistance by a preponderance of the evidence).

(ECF No. 16-2 at 7-8.)

### 3.  Analysis

Fritsche contends, *inter alia*, that: (1) "[d]efense counsel was simply incorrect when in [sic] believing that [K.L.] could not consent as a matter of law;" (2) a defense strategy "based on a mistake of law is not reasonable and constitutes deficient performance;" (3) defense counsel "believed the prosecutor would object arguing that [K.L.] was too young to consent;" but (4) "[t]he objection would have been unfounded" because "[t]here is no provision in Nevada law that establishes that a minor child's factual inability to consent as a matter of law" which "is a factual question for the jury." (ECF No. 28 at 45-46.)[27]

///

---

[27]Throughout his argument on this ground, Fritsche states that the conviction was for "sexual abuse of a minor." Fritsche was convicted of one count of sexual *assault* and one count of lewdness with a child under the age of fourteen years. (ECF No. 15-1.) On the first count, he was convicted of sexual assault, not sexual abuse. That count further was not qualified as sexual assault "of a minor." The age of the victim under the then-applicable version of NRS § 200.366 served only to determine the appropriate sentence for the offense. *E.g.*, *Alotaibi v. State*, 404 P.3d 761, 762 (Nev. 2017). In short, he was convicted of sexual assault, period, not sexual abuse of a minor.

46

However, as Jury Instruction Number 14 reflects, culpability for sexual assault did not turn under the governing statute solely upon whether the victim's words or conduct constituted "consent." The statute instead provided at the relevant time that "[a] person is guilty of sexual assault if he . . . subjects another person to sexual penetration . . . against the will of the victim **or** *under conditions in which the perpetrator knows or should know that the victim is mentally or physically incapable of resisting or understanding the nature of his . . . conduct*." NRS § 200.366 (emphasis added).

The principal case upon which Fritsche relies on this point, *Shannon v. State*, 783 P.2d 942 (Nev. 1989), reinforces the disjunctive nature of the non-consent element under NRS § 200.366. The court noted in that case, consistent with Jury Instruction No. 20 in Fritsche's case, that the factors to be considered in determining whether sexual activity was against the will of a child included, *inter alia*, the relationship between the perpetrator and the victim, the child's age, and the child's maturity level. *Id.* at 947. The court concluded that the circumstances in that case supported a finding of sexual assault—of a thirteen-year-old boy—because the defendant "knew or should have known the child was mentally or physically incapable of resisting or understanding the nature of the conduct," as his "elaborate scheme was designed to achieve this very end." *Id.*

In the present case, counsel did *not* testify, as Fritsche suggests, that K.L. could not consent "as a matter of law." He instead testified as a general matter that "I don't know where that line is" as to when a child is too young to legally consent. His testimony and the state courts' finding do not necessarily reflect anything more than that counsel believed that K.L. was "eight years old *and* not competent to give consent." Such an assessment was supported by evidence reflecting that the innocent eight-year-old, who had been held back developmentally in school due to her vision impairment, was "incapable of . . . understanding the nature of [Fritsche's] . . . conduct" for purposes of consent under NRS § 200.366. (*See supra* Sections III.A. and III.E.)

Nor did counsel testify, as Fritsche suggests, that he believed that the prosecutor would "object" to a consent defense in some manner that would prevent him from even

47

arguing such a defense to the sexual assault charge as a matter of law. The problem that defense counsel instead faced at trial was that the State would argue *to the jury* that there was no consent because of K.L.'s youth and immaturity, *i.e.*, that K.L. was "incapable of . . . understanding the nature of [Fritsche's] . . . conduct" for purposes of consent under NRS § 200.366. That would have been a quite strong, if not compelling, argument by the State on the record in Fritsche's case. The defense then would have been pursuing a markedly weak consent defense that directly contradicted the defense theory of the case pursued throughout the trial that *Fritsche did not do the sexual activity*. As defense counsel's hearing testimony suggests, pursuing a consent defense premised on K.L. saying that Fritsche's sex acts felt "good, good, good, good" would "impress[] to the jury that these are actual events . . . not something that is manufactured in a child's mind[,] . . . a reaction to actual events." Defense counsel's hearing testimony clearly reflects that he did not want to do anything that left the jury with such an impression in a case where he instead was arguing that Fritsche did not do the acts at all.

Fritsche's argument that counsel's defense strategy was based upon a mistake of law and an erroneous belief that the State had a viable objection negating a consent defense as a matter of law therefore is unfounded. Contrary to Fritsche's suggestion, defense counsel's action clearly was premised upon an understanding of what most likely would have occurred *before the jury at trial* if he sought to pursue a defense that the eight-year-old K.L. consented to the sexual activity, in light of the actual provisions of NRS § 200.366 and the trial evidence.[28]

Fritsche in large measure implicitly concedes that it would have been imprudent to actually argue consent in this case when he further argues as follows:

> In addition to counsel's failure to understand governing legal principles, trial counsel's argument that it would inflame the jury to argue consent is unconvincing. The claim here is not that trial counsel was ineffective for

---

[28]Fritsche's reliance upon the Hawaii decision in *State v. Jones*, 29 P.3d 351, 372 (Haw. 2001), is misplaced. Holdings of the Supreme Court of Hawaii regarding the statutes in that state do not establish that defense counsel rendered deficient performance in his handling of the defense against the charge brought against Fritsche, in Nevada, under NRS § 200.366.

failing to argue the lesser included offense during summation. Counsel's deficient performance lies in his failure to request the lesser included jury instruction at all. It need not have been argued but it would have been there for the jury to consider. It falls below reasonable performance standards to fail to propose a lesser included jury instruction that is supported by the trial evidence. . . . .

(ECF No. 28 at 47.)

Fritsche thus essentially argues that counsel should have requested a statutory seduction offense instruction and then remained mute about consent during his closing argument. The defense then would have opened itself to rebuttal argument by the State that in one fashion or another suggested that the defense apparently did not have faith in the defense that Fritsche did not do the acts but nonetheless did not have the temerity to actually argue that the eight-year-old K.L. consented to the sexual activity under the disjunctive standard in NRS § 200.366. While following such a strategy perhaps might have provided a basis for a debatable ineffective-assistance claim in its own right, nothing in *Strickland* requires a defense lawyer to pursue such an ill-conceived strategy as opposed to presenting a clear, consistent, and unqualified defense that the defendant did not do the acts charged.[29]

The state appellate court's rejection of this claim was not an objectively unreasonable application of *Strickland*'s performance prong.

Ground 1(e) does not provide a basis for relief.[30]

---

[29]*Cf. Butcher v. Marquez*, 758 F.2d 373 (9th Cir. 1985) (defense counsel was not deficient for failing to seek lesser-included offense instruction where the defense theory of the case was that the defendant did not commit the act and it could be inferred that counsel believed that requesting the instruction would have been fruitless or even harmful). Fritsche does not cite to the portion of defense counsel's testimony where he allegedly argued that "it would inflame the jury to argue consent." The Court was unable to find where he so testified. Rather, it appears from his testimony that he was concerned about leaving the jury with the impression that the acts occurred when he instead was arguing throughout the trial that they did not—which was a substantial and real concern.

[30]In 2017, the Supreme Court of Nevada held in *Alotaibi*, 404 P.3d 761, that statutory sexual seduction is not a lesser-included offense of sexual assault. The court so held as to (a) the same statutory elements in the two statutes that governed at the time of Fritsche's offenses under (b) the same "elements test" for determining whether an offense is a lesser-related offense that applied at the time of Fritsche's offenses. (The same pertinent language was used in the two statutes as amended prior to Fritsche's 2007 to 2008 offenses.) The state supreme court dismissed prior contrary expressions in *Robinson v. State*, 881 P.2d 667 (Nev. 1994), as constituting *dicta* in a case that was decided before the court clarified the governing test for determining whether an offense is a lesser-related offense in 2001. The court stated that the issue of whether statutory

49

## IV. CONSIDERATION OF A CERTIFICATE OF APPEALABILITY

Under Rule 11 of the Rules Governing Section 2254 Cases, the district court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to the applicant.

As to the claims rejected by the district court on the merits, under 28 U.S.C. § 2253(c), a petitioner must make a "substantial showing of the denial of a constitutional right" in order to obtain a certificate of appealability. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000); *Hiivala v. Wood*, 195 F.3d 1098, 1104 (9th Cir. 1999). To satisfy this standard, the petitioner "must demonstrate that reasonable jurists would find the district

///

---

sexual seduction was a lesser-included offense of sexual assault instead had "not been clearly resolved by this court" prior to *Alotaibi*. 404 P.3d at 764. The court further disavowed *Rosas v. State*, 147 P.3d 1101 (Nev. 2006), to the extent that *Rosas* suggested that a provision that affected only sentencing could be considered as an element for purposes of the elements test. The court stated that its prior decisions had been "somewhat inconsistent" on that point. 404 P.3d at 765.

If *Alotaibi* establishes Nevada law also at the time of Fritsche's offenses, it then would negate the moving premise of Fritsche's claim, *i.e.,* that statutory sexual seduction is a lesser-included offense of sexual assault. Fritsche then would not be entitled to relief on Ground 1(e) even on a *de novo* review, because a statutory sexual seduction instruction would not have been mandatorily available on request as a lesser-included offense instruction. It could be argued that *Alotaibi* establishes what the governing law was at the time of Fritsche's offenses because resolving an inconsistency in prior state court decisions is not necessarily the same as overruling clearly established law. If *Alotaibi* does establish Nevada law at the relevant time, then a speculative possibility that the trial court might have granted a request for a statutory sexual seduction instruction prior to *Alotaibi* would not give rise to a basis for relief. *Strickland* states an objective standard that applies without regard to the idiosyncrasies of a particular decisionmaker, such as in the circumstance of a trial court possibly giving an instruction not required by the governing law. *E.g., Lee v. United States*, 137 S. Ct. 1958, 1970 (2017). This Court has no occasion to reach any issue regarding the potential impact of *Alotaibi*, however, because the state appellate court's rejection of Ground 1(e) withstands review under AEDPA on the basis stated by that court.

Fritsche argues cumulative prejudice from all five grounds of ineffective assistance of trial counsel considered together. The state appellate court, however, rejected all five grounds instead on the basis that Fritsche did not show deficient performance on any of the grounds; and the rejection of the claims on this basis withstands review under AEDPA. Thus, there is no occasion to consider cumulating prejudice across the five claims. Fritsche at times focuses his arguments instead on the state district court's findings, conclusions and order. (*See, e.g.*, ECF No. 28 at 22.) The decision reviewed under AEDPA, however, is the last reasoned decision of the state courts on his ineffective-assistance claims, which is the decision of the state appellate court in this case.

court's assessment of the constitutional claim debatable or wrong." *Slack*, 529 U.S. at 484.

The Court denies a certificate of appealability as to all claims. Regarding Ground 1(a) concerning an alibi defense, Fritsche's claim is based upon multiple fundamental misstatements of the record. As the Court noted in the discussion of the ground, it would have been, as an extreme understatement, seriously ill-advised for trial counsel to pursue an alibi defense based upon the actual facts in the record. (*See supra* Section III.A.) Fritsche's arguments regarding Ground 1(b), 1(c) and 1(d) similarly are based in full or in part upon critical misstatements of the record. At a bare minimum, to carry his burden under AEDPA, a petitioner must in the first instance base his argument on an accurate and forthright representation of the underlying state court record. As to all five claims of ineffective assistance of counsel, reasonable jurists would not find the Court's assessment of the claims to be debatable or wrong, for the reasons discussed herein.

**V. CONCLUSION**

It is therefore ordered that the petition is denied on the merits.

It is further ordered that a certificate of appealability is denied.

The Clerk of Court is instructed to enter final judgment accordingly and close this case.

DATED THIS 24th day of October 2018.

_____
MIRANDA M. DU
UNITED STATES DISTRICT JUDGE